[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 18, 2005
THOMAS K. KAHN
CLERK**

No. 03-16373
Non-Argument Calendar

_____

D.C. Docket No. 02-00021-CV-CDL-4

CAROL ANN POTTER,

Plaintiff-Appellant,

versus

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(May 18, 2005)**

Before ANDERSON and WILSON, Circuit Judges, and SHAPIRO[*], District
Judge.

_____

[*] Honorable Norma L. Shapiro, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

PER CURIAM:

Carol Ann Potter ("Ms. Potter") filed this action against Liberty Life Assurance Company of Boston ("Liberty") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended. She appeals the district court's grant of summary judgment in favor of Liberty.

**FACTS AND PROCEDURAL HISTORY**

Ms. Potter worked as a senior claims underwriter at American Family Life Assurance Company of Columbus ("AFLAC"). She suffered from physical symptoms variously diagnosed as mixed connective tissue disorder, fibromyalgia, Raynaud's phenomenon and collagen vascular disorder.[1] Ms. Potter took medical leave; AFLAC terminated her after she exhausted her leave. Before she was terminated, Ms. Potter had applied for long-term disability benefits under a Liberty policy. After reviewing her medical files, Liberty denied her claim.

Ms. Potter's medical records show she was diagnosed with Raynaud's phenomenon in 1979. Ms. Potter's primary care physician, Dr. Elizabeth Martin

---

[1] Mixed connective tissue disorder is a rheumatic disease characterized by Raynaud's phenomenon (coldness in extremities), arthritis or pain in the joints, swelling of the hands, scleroderma, and other symptoms. Fibromyalgia and collagen vascular disorder are diseases with similar symptoms.

("Dr. Martin"), diagnosed Ms. Potter with mixed connective tissue disorder ("MCTD"). Laboratory tests showed Ms. Potter had a high antinuclear antibodies titer with a speckled pattern, consistent with MCTD. Dr. Fox, a rheumatologist to whom Dr. Martin referred Ms. Potter, diagnosed her with fibromyalgia. A third physician, Dr. Folarin Olubowale, diagnosed her with collagen vascular disorder. Ms. Potter's symptoms included, *inter alia*, generalized joint pain, bursitis, hip pain, fatigue, and depression.

Ms. Potter first took medical leave from AFLAC on October 8, 1999. She returned to work on January 10, 2000, but was unable to work full time. On many days, she could not work at all. Her claim for long term disability benefits was received by Liberty on February 3, 2000. The claim application included Dr. Martin's attending physician statement diagnosing Ms. Potter with MCTD. Dr. Martin stated Ms. Potter should be restricted to a daily maximum of four hours of clerical work, and she suffered from a "class 3" or moderate mental impairment, defined as "Patient is able to engage in only limited stressful situations and engage in only limited interpersonal relations."

Liberty claims manager Paige Cancer ("Ms. Cancer") was assigned to Ms. Potter's claim. Having no medical training, Ms. Cancer relied on a nurse file reviewer to evaluate the claim. The nurse began her review by analyzing doctors'

notes of Ms. Potter's visits with Dr. Martin and Dr. Fox. As of March 10, 2000, the nurse had notes from Dr. Martin of an office visit on December 27, 1999, and notes from Dr. Fox of office visits through January 4, 2000. As of January 4, Dr. Fox had not yet diagnosed Ms. Potter with fibromyalgia, and the office visit notes suggested that Ms. Potter did not have MCTD. Dr. Fox diagnosed Ms. Potter with fibromylagia in an office visit of February 16, 2000, but these notes had not yet been sent to the nurse. The nurse was aware that Ms. Potter had made additional visits to Dr. Fox, and wrote that she would require additional information from both Dr. Martin and Dr. Fox.

On March 15, 2000, the nurse was still awaiting additional office visit notes from Dr. Fox, and her attempts to contact Dr. Martin had been unsuccessful. The nurse mailed Dr. Martin a questionnaire asking for the basis on which she had diagnosed MCTD, whether Dr. Martin would recommend a psychiatric evaluation, and other information. A letter accompanying the questionnaire asked Dr. Martin to respond by March 24, 2000.

Also on March 15, 2000, before the nurse received any of the additional information she sought from Ms. Potter's physicians, Ms. Cancer denied Ms. Potter's claim in letter recounting the medical information on file and stating that there was no medical information to support Ms. Potter's claim of disability. The

4

denial was based on Dr. Fox's outdated office notes stating Ms. Potter did not have MCTD. In her deposition, Ms. Cancer offered no explanation for denying the claim before the nurse's review was complete or whether it was normal practice to do so. She stated that Liberty was having trouble reaching Dr. Martin, but could not recall whether anyone contacted Ms. Potter about the difficulty.

Soon after Liberty denied Ms. Potter's claim, Dr. Martin wrote in her office visit notes:

> Apparently there were some problems w/her Disability claim and the company went ahead and made a decision to deny her claim w/o having full documentation from either my office, Dr. Fox's office or Dr. Olubolwale. [...] On review it does not appear that they have had adequate records for her. Will be happy to forward-on the appropriate records from our office awa copies from the other consultants as appropriate. Will also forward responses from questions posed to me from the case manager; however, it is confusing to me that they requested my response by the 23rd, yet they have already ruled.

Despite Ms. Cancer's denial of the claim, the nurse file reviewer continued her review and received additional information from Dr. Fox and Dr. Martin. On March 24, 2000, the nurse noted that Dr. Fox had diagnosed Ms. Potter with fibromyalgia on the office visit of February 16, 2000. She also received Dr. Martin's questionnaire responses explaining her diagnosis of MCTD and recommending a psychiatric consult. In her notes, the nurse wrote that the case

5

"may need IME (independent medical examination)." Later notes by the nurse stated she would need to contact Dr. Fox again, as well as Ms. Potter's therapist. In subsequent communications with the nurse, Dr. Fox reiterated the diagnosis of fibromyalgia, and cited abnormal laboratory results to support the diagnosis.

On May 16, 2000, Ms. Potter wrote a letter to Liberty to appeal the denial of her claim. The appeal was reviewed by Kathleen Malia ("Ms. Malia"), an appeal review consultant working as an independent contractor for Liberty. Ms. Malia, denying the appeal, stated:

> The determining factor, however, is the claimant's ability to perform part time work, although she may have had difficulty with full time employment. The policy only allows partial following a period of total disability for which a benefit has been paid.

The appeal recommendation also stated that Ms. Potter would not be eligible for partial disability because she would be required to work part-time. Ms. Potter alleged she was unable to work even part-time, and AFLAC would not hire her on a part-time basis regardless of her ability to do so.

Ms. Malia relied on the evaluations supplied by Dr. Fox and Dr. Martin, specifically Dr. Martin's recommendation that Ms. Potter was capable of four hours of sedentary activity daily.[2] Ms. Potter's duties required substantial

_____

[2] Ms. Malia also testified that Dr. Fox stated Ms. Potter could work full time, but Ms. Potter and Dr. Fox disputed this. Liberty could not produce any written documentation in

interpersonal relations, and more than sedentary activity (e.g., training personnel and assisting in workshops).[3] When asked how the mental limitations placed by Dr. Martin on Ms. Potter would affect her ability to work, Ms. Malia replied, "I would defer that question to a doctor." But Ms. Malia did not refer Ms. Potter's case to a doctor for evaluation, nor did any other Liberty agent.

Ms. Cancer stated she could not assess how mental limitations would have affected Ms. Potter's ability to perform her duties, and it would be the job of a nurse care manager to do so. The nurse care manager solicited Dr. Martin's advice regarding a psychiatric evaluation, but the nurse had not yet received the doctor's

---

support. Since issues of material fact must be resolved in favor of the non-moving party, the district court erred in considering this evidence when deciding whether Liberty had a reasonable basis for its decision.

[3] Ms. Potter's job description lists her "principal duties and responsibilities":

1. Appraises, clarifies and takes action to approve, rate, modify or decline applications for insurance. Responds to medical, policyholder and field force inquiries. Reviews and processes requests for additional coverage or changes to existing policies. Has unlimited approval authority for all lines of business. 70%

2. Trains, documents and provides instruction to Underwriting support personnel in technical decision making processes. Assists manager and unit supervisors with workshops. Assists WWHQ personnel with specific underwriting questions (includes Beelines and Keylines). 15%

3. Reviews and decodes confidential medical information; generates coding to be reported to the Medical Information Bureau. Assists manager with special medical studies and reports. 10%

4. Performs other duties as assigned by manager. 5%

recommendation when the claim was initially denied. Liberty did not employ any vocational expert or consultant to evaluate the demands of Ms. Potter's job as they related to the physical and mental restrictions assessed by Dr. Martin.

After Ms. Potter retained counsel, her renewed appeal cited other physicians' examinations and additional medical records supporting the diagnosis of MCTD, but Liberty again rejected her appeal. Ms. Potter later obtained disability benefits from Social Security. The administrative law judge found Ms. Potter was "unable to sustain even this limited [part-time] amount of sedentary work." Liberty, informed of the favorable Social Security decision, declined to take it into account and denied her appeal again. Ms. Potter then filed this ERISA action against Liberty. The district court granted summary judgment for Liberty because Liberty failed to show the claim denial was correct, but did show its decision was not tainted by self-interest.

**STANDARD OF REVIEW**

We review a grant of summary judgment *de novo*. *Cole v. United States Dep't of Agric.*, 133 F.3d 803, 805 (11th Cir. 1998), and apply the same legal standard as the district court. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). Summary judgment is appropriate only if the pleadings, depositions, answers, admissions and any affidavits create no genuine issue of

material fact.  Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The policy at issue states, "Liberty shall possess the authority, in its sole discretion, to construe the terms of the policy and to determine benefit eligibility hereunder."  When a plan gives a claims administrator discretion to deny a claim, but it acts under a conflict of interest, the court must apply a heightened arbitrary and capricious standard of review.  *Buckley v. Metropolitan Life*, 115 F.3d  936, 939 (11th Cir. 1997).  First, the court decides if the claims administrator's decision is "wrong".  *Godfrey v. BellSouth Telecomm., Inc.*, 89 F.3d 755, 758 (11th Cir. 1996).  If so, the court then determines whether the decision is nonetheless "reasonable" (i.e., not arbitrary and capricious).  *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994).  If the decision is wrong but reasonable, the burden is on the claims administrator to show the decision was not tainted by self-interest.[4]  *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566-67 (11th Cir. 1990).  This standard applies both to the interpretation of the policy language and factual determinations.  *Torres v. Pittston Co.*, 346 F.3d 1324, 1332

---

[4] The question of taint from self-interest should not be confused with the conflict of interest determination.  A party may be acting under a conflict of interest, but without the taint of self-interest.

(11th Cir. 2003).

The parties agree that Liberty had discretion to interpret the policy. Since Liberty was responsible for paying claims as well as determining their validity, the parties also agree Liberty acted under a conflict of interest. *See Brown*, 898 F.2d at 1561. The heightened arbitrary and capricious standard of review applies to Liberty's denial of Ms. Potter's claim.

**DISCUSSION**

Liberty argues Ms. Potter was not disabled under the definition of "disability" in the policy, but would have been "partially disabled" had she worked part-time. Ms. Potter contests Liberty's interpretation of the policy provisions defining "disability" as well as Liberty's factual determination that she was not disabled.

The policy defined "disability":

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

> i. if the Covered Person eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

> ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of

10

Any Occupation.

The policy defined "partial disability":

"Partial disability" or "Partially Disabled", with respect to Long Term Disability, means the Covered Person, as a result of Injury or Sickness, is able to:

> 1. perform one or more, but not all, of the Material and Substantial Duties of his Own Occupation or Any Occupation on an Active Employment or a part-time basis; or
>
> 2. perform all of the Material and Substantial Duties of his Own Occupation or Any Occupation on a part-time basis; and
>
> 3. earn between 20% and 80% of his Basic Monthly Earnings.

Liberty contends the definitions of "disabled" and "partially disabled" must be read in conjunction, and are mutually exclusive. Under this interpretation, a person who could not perform all the duties of her occupation but who could work part-time or perform some of the duties would be "partially disabled," but not "disabled." Ms. Potter argues that the definitions are not mutually exclusive, and that any person who could not perform all the duties of her job would be "disabled". The "partially disabled" category is only a subset of the "disabled" category, by this argument.

Liberty's interpretation is consistent with a reading of the policy in its entirety. The plan provides for "partial disability" benefits apart from "disability"

11

benefits. A beneficiary can receive benefits under one of the two categories, not both. The categories are mutually exclusive. *See, e.g., Falik v. Penn Mut. Life Ins. Co.*, 204 F.Supp.2d 1155, 1157 (E.D. Wis. 2002) (a claimant eligible for "residual disability" benefits could not also be eligible for "disability benefits").

Ms. Potter also argues that because AFLAC refused to hire her on a part-time basis, she was not "able" to work for them on a part-time basis. She contends that Liberty bore the burden of showing she was "able" to work part-time because she could have been hired on a part-time basis by another employer. Liberty argues that the term "able" refers solely to a person's inherent functional capacity to perform the duties of the occupation, not whether such a part-time position existed at AFLAC or elsewhere.

The term "able" must be read in context. In the provisions defining disability and partial disability, "able" refers to the employee's ability to perform the duties of the occupation. Being "able to perform" means the employee has the functional capacity to perform. *See, e.g., Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (plan administrator did not have to insure the availability of an alternative job); *Jestings v. New England Telephone and Telegraph Co.*, 757 F.2d 8, 10 (1st Cir. 1985) (plan looking solely to employee's health, not job availability, was reasonable).

Ms. Potter relies on language in the Policy providing for the termination of partial disability benefits when "the Covered Person is able to work in their [sic] Own Occupation on a part-time basis, but chooses not to." She points out that one does not "choose" not to work part-time when no such position is available. This may be true, but a functionally capable person can choose not to work, so this provision does not conflict with Liberty's interpretation of "able". Even if partial disability benefits could not be terminated when no partial position is available, Ms. Potter is not appealing a termination of disability benefits. The district court did not err in finding Liberty's interpretation of the policy was correct.

The heightened arbitrary and capricious standard also applies to Liberty's factual determination that Ms. Potter was not disabled. Under this standard, Liberty can prevail by showing the determination was not "wrong." Even if the determination were wrong, Liberty can still prevail by showing it was not arbitrary and capricious, nor tainted by self-interest.

Liberty argues Ms. Potter was able to work four hours daily, so she would have been eligible for partial disability benefits only. The district court found material issues of fact regarding Ms. Potter's ability to perform her job part-time, and ruled that Liberty failed to show its decision was correct.

The district court did not err in this finding. Although some of Ms. Potter's

medical records suggested she could perform four hours of sedentary work daily, Ms. Potter disputed this in her testimony. After returning from medical leave, Ms. Potter was unable to work part-time many days. Liberty also failed to demonstrate that the mental limitations imposed by Dr. Martin would allow Ms. Potter to work on a part-time basis. Finally, the Social Security Administration found her disabled.[5] These circumstances created issues of material fact regarding Ms. Potter's eligibility for disability benefits.

To prevail, Liberty must show that its erroneous determination of Ms. Potter's status was not arbitrary and capricious, and not tainted by self-interest. Normally, a decision to deny benefits is arbitrary and capricious if "no reasonable basis exists for the decision." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001). Under the heightened standard, a decision is tainted by self-interest if it advances the conflicting interests of the fiduciary at the expense of the affected beneficiary, and the fiduciary cannot justify the decision on the ground of its benefit to the class of all participants and beneficiaries. *Brown*, 898 F.2d at 1566-67. Also, "[a]n improper motive sufficient to set aside a

---

[5] A district court may consider a Social Security Administration determination of disability in reviewing a plan administrator's determination of benefits under a plan governed by ERISA, although it is not determinative. *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994).

fiduciary's decision may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction." *Id.* at 1566, n.11 (citing with approval *Colket v. St. Louis Union Trust Co.*, 52 F.2d 390 (8th Cir. 1931)).

As a reasonable basis for its determination, Liberty claims Dr. Martin concluded that Ms. Potter could perform "her sedentary occupation" on a part-time basis. This is incorrect; Dr. Martin never concluded Ms. Potter's occupation was sedentary, or that she could work on a part-time basis. Dr. Martin merely said Ms. Potter could perform four hours of sedentary activity with mental limitations restricting her to limited stress and interpersonal relations. Dr. Martin never determined whether Ms. Potter's actual occupational duties were sufficiently sedentary, or whether the stress level and degree of interpersonal interactions were too demanding. Liberty did not conduct this analysis either. Ms. Malia, Liberty's appeals reviewer, stated that such an analysis would have required her to consult a doctor, but Liberty never did so. Liberty did not employ a vocational expert to assess the demands of Ms. Potter's work in light of her restrictions. Liberty's nurse consultant noted that Dr. Martin recommended a psychiatric evaluation, but Liberty never obtained one.

But even if Liberty had a reasonable basis for its decision, Liberty must also

15

show its decision was not tainted by self-interest. Liberty argues that its claims reviewers were not compensated or given bonuses for denying claims, and they had no knowledge of the potential cost to Liberty if Ms. Potter's claim was successful. Also, Ms. Malia, the appeals reviewer, was an independent contractor.[6] In rebuttal, Ms. Potter points to the cursory and incomplete nature of the initial claims review as evidence that Liberty was motivated by self-interest. Ms. Cancer, Liberty's claims reviewer, initially denied the claim before her own nurse consultant had completed her investigation. The nurse consultant was still in the process of collecting medical records, and sent Dr. Martin a questionnaire requesting additional information on the same day the claim was denied. Dr. Martin, on whose opinion Liberty relies, expressed concern that Liberty denied the claim prematurely without sufficient investigation. Liberty obtained copies of the medical records in which Dr. Martin noted this concern, yet continued to rely incorrectly on her earlier, out-of-context statements in denying Ms. Potter's appeals.

---

[6] Liberty, relying on an unpublished district court opinion, argues that these facts are sufficient to prove the lack of taint from self-interest. *See Metropolitan Life Ins. Co. v. Nasworthy*, No. 5:00-CV-406-4(DF) (M.D. Ga. May 13, 2002). Even if this court were bound by *Nasworthy*, the case is distinguishable. First, the court's decision in *Nasworthy* rested in part on the claimant's refusal to comply with the plan administrator's request for medical documentation. More importantly, the insurer presented evidence to show that its payment of that claim would result in increased premiums for other beneficiaries.

Under the heightened arbitrary and capricious standard, the burden lies with Liberty to demonstrate lack of taint from self-interest. *Brown*, 898 F.2d at 1566. As the moving party with the burden of proof, Liberty must affirmatively show the absence of a genuine issue of material fact; it must support its motion with credible evidence that would entitle it to a directed verdict at trial. *U.S. v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc). This high standard requires Liberty to prove that the factfinder would be compelled to find the decision beneficial to the class of all participants and beneficiaries. *Brown* at 1567. The district court stated that Liberty's decision was "in the best interests of all participants and beneficiaries" but cited no facts or evidence in support because Liberty presented none. Liberty failed to show its decision to deny Ms. Potter's claim was "calculated to maximize benefits to participants in a cost-efficient manner." *Lee*, 10 F.3d at 1552.

By contrast, the incomplete and cursory nature of Liberty's initial investigation created issues of material fact from which a reasonable factfinder could conclude Liberty's decision was motivated by self-interest. In granting summary judgment, the district court misconstrued *Brown*'s test for self-interest and wrongly placed the burden of proof on Ms. Potter.

17

**CONCLUSION**

The district court's grant of summary judgment was in error. We

**REVERSE** and **REMAND** for proceedings not inconsistent with this opinion.