**Jane M. MATTOX, Plaintiff,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, a subsidiary of the CIGNA Corporation, Defendant.**

**Civil Action No. 1:06–cv–2090–TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 13, 2008.

1310

Pamela Ilene Atkins, Atkins & Associates, Atlanta, GA, for Plaintiff.

Elizabeth Johnson Bondurant, Nikole Marie Crow, Smith Moore, LLP, Atlanta, GA, for Defendant.

## *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

### I. Background

Plaintiff Jane Mattox, while employed by AMVESCAP as an executive administrative assistant to the general counsel, participated in her company's long-term disability plan ("LTD Plan") and life insurance plan ("Life Plan") as defined and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Defendant Life Insurance Company of North America ("LINA") issued and funded both plans, and serves as the claims administrator and payor for each.

Mattox alleges that her long-term disability benefits ("LTD Benefits"), canceled as of September 20, 2003, should be reinstated, that her LTD Benefits should be paid at sixty-six percent rather than sixty percent of her income, and that she is

entitled to a waiver of her life insurance premium under the Life Plan. LINA disputes these allegations and separately alleges that it has overpaid LTD Benefits to Mattox in the amount of $35,582.17. The policy provisions and relevant facts regarding each of these allegations are separately laid out below.

### A. Reinstatement of Mattox's LTD Benefits

The LTD Plan defines "disabled" as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:

1. Unable to perform all the material duties of his or her Regular Occupation [1] or a Qualified Alternative; or

2. Unable to earn 80% or more of his or her Indexed Covered Earnings.

The Insurance Company will require proof of earnings and continued Disability.

Further, the LTD Plan sets forth the requirements that an employee must meet prior to receiving disability benefits:

The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid. . . .

Additionally, the LTD Plan has several limitations, including a mental illness provision:

Mental Illness, Alcoholism and Drug Abuse Limitation

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

. . .

2. Anxiety Disorders

. . .

4. Depressive Disorders

. . .

7. Mental Illness

On June 29, 2001, Mattox filed a short-term disability claim with LINA. The proof-of-loss form she submitted stated that "employee cannot concentrate at work due to suicidal thoughts with depression." [2] Mattox submitted a physician's statement from Michael Prudent, M.D., a psychiatrist, to support her claim, which stated under the heading "mental impairment" that Mattox was suffering from a "major depressive episode," "nicotine dependence," and "obesity, sleep apnea, [and] musculoskeletal disease."

LINA approved Mattox's short term disability claim on July 26, 2001, with benefits to be paid from June 28, 2001 through August 10, 2001.

In August 2001, while receiving STD benefits, Mattox was diagnosed with bilat-

---

1. An employee's "Regular Occupation" is then defined as "[t]he occupation the Employee routinely performs at the time Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy."

2. A LINA representative filled out the proof-of-loss form based on information Mattox provided on June 29, 2001.

eral heel spurs and had surgery on her left heel on August 14. Stuart Tuck, M.D., a podiatrist, performed the surgery. Based on Dr. Tuck's report that Mattox would be able to return to work on September 18, 2001, when her walking cast was removed, LINA extended Mattox's short term disability payments through that date.

Although Dr. Tuck released Mattox to return to work on September 18, Mattox maintained that she remained disabled due to her depression. Because the time period during which Mattox could receive STD benefits expired on September 25, 2001, LINA forwarded her claim file to the LTD division for review.

In conjunction with Mattox's LTD claim, LINA requested up-to-date records from Dr. Prudent on September 26, 2001, which were received on October 25. These records indicated that Mattox had some suicidal ideation and a tearful affect, and that she was "incredibly depressed."

LINA approved Mattox's LTD claim, on a non-admission of liability basis, on November 15, 2001. LINA stated in its conditional approval letter to Mattox that the "investigation is still incomplete" and that a "final determination will be made as soon as the outstanding information has been received and reviewed."

During this time period, LINA also sent a LTD proof-of-loss form to Mattox to sign. This form had been filled out by a representative at LINA and listed "depression, symptoms are suicidal thoughts" as the reason Mattox could not work. When Mattox returned a signed copy of the form to LINA on November 26, 2001, however, she had crossed out the above reason and replaced it with "slipped disc with stenosis" and further stated that she "cannot walk or stand long enough to work or function while there." In addition to Dr. Prudent's name and address, which had been filled in by LINA's representative, Mattox listed two more treating physicians: David Hubbell, M.D., an orthopedic surgeon, and Omar Najjar, M.D., a general practitioner at the Decatur Clinic.

LINA then requested records from the Decatur Clinic, which were received on November 28, 2001. Included in these records was a November 5, 2001 office note, written by a physician's assistant, stating that Mattox was being treated for chronic back pain, that she had pain radiating into her right sacroiliac and into her right buttock, that she was unable to perform her normal activities of daily living, and that she had been referred to Dr. Hubbell at the Emory Orthopedic and Spine Center for an evaluation.

On December 4, 2001, Mattox completed a Disability Questionnaire for LINA in which she reported suffering "excruciating pain when walking or standing," needing to sit down to brush her teeth and get dressed, being unable to cook, clean or do laundry on a regular basis, and taking ten different medications, including 1200 milligrams of Neurontin for pain each day.

On February 19, 2002, LINA sent a letter to Mattox approving her LTD claim from September 21, 2001 through September 20, 2003 under the mental illness provision of the LTD Plan. However, the approval letter also stated the following:

> The most recent documentation on file reveals that you suffer from knee/foot and back pain. On January 15, 2002, we faxed a request for current documentation to Dr. Najar [sic] and Dr. Hubbell. To date, we have not received a response so a second request was faxed today. We ask that you please contact your physician's office and urge them to respond to our request by no later than March 5, 2002.

On February 21, 2002, Dr. Prudent faxed updated records for Mattox to LINA. These included office notes from Mattox's sessions with Dr. Prudent on

September 11 and 18, October 2 and 31, November 28, 2001, and January 8, 2002, which indicated that throughout the sessions, Mattox was either depressed or severely depressed and had a tearful affect. However, Mattox self-reported during the November 28 session—which occurred soon after her slipped disc had been diagnosed—that she was not feeling depressed.

In addition, Dr. Prudent forwarded an Evaluation of Psychiatric Abilities ("EPA") that LINA requested he complete on Mattox's behalf. In the EPA, Prudent reported that Mattox suffered from a severe deficit with regard to her affect, a moderately severe deficit with regard to her behavior, a moderate deficit with regard to her ability to think, and a mild deficit with regard to her perception and judgment. Further, Prudent indicated that Mattox's depression prevented her from performing repetitive work, influencing people, performing a variety of duties, performing under stress, attaining precise limits/tolerances, and dealing with people.

On April 18, 2002, Mattox disputed LINA's limited approval of LTD Benefits, stating that her "disability is due to a slipped disc with stenosis, not mental illness," and that therefore the mental illness limitation did not apply. Mattox's letter also stated that her depression had been greatly alleviated by the discovery of the source of her back pain.

The next day, LINA responded by stating the following:

> [P]lease understand that the medical [documentation] on file supports your inability to work at the present time due to your psychological condition. We have no updated medical information, despite our requests, supporting that you are limited from your occupation as a result of a physical condition. I would encourage you to contact the doctor(s) who is/are treating you for your physical condition and ask that they provide us with medical information supporting your inability to work. Until such information is received, your claim remains subject to the 24 month Mental Illness provision and your benefit termination date will be September 20, 2003.

As of the date of this letter, the only medical record in Mattox's claim file related to her back pain was the November 5, 2001 office note from the Decatur Clinic indicating the location of her pain and referring her to Dr. Hubbell.

On May 15, 2002, Mattox completed an ADL Questionnaire in which she stated that she experienced excruciating lower back pain when standing or walking any length of time, used the handrails on the stairs in her home if she had to go upstairs, used a rolling chair in the kitchen, sat down to brush her teeth and hair, and could not stand in the shower long enough to both bathe and wash her hair.

On August 28, 2002, LINA received Mattox's medical records from Dr. Hubbell.[3] These records included notes from Dr. Hubbell's initial evaluation of Mattox on November 21, 2001, during which Dr. Hubbell diagnosed "a grade 1 spondylolisthesis of L4 on L5,"[4] noted "findings consistent with neurogenic claudication," stated that he "would suspect a component of

---

3. LINA had sent another request to Dr. Hubbell, as well as to Drs. Najjar, Prudent, and Mark T. Pollock, M.D. on August 6, 2002, for updated records. Dr. Pollock, with the Pulmonary & Sleep Specialists, responded on January 30, 2003, that he could not fill out disability paperwork for Mattox because he had not seen her since April 8, 2002.

4. Dr. Hubbell's diagnosis was supported by x-ray films reviewed by Hanna Soheil, M.D., who noted that the x-rays showed "[p]rominent degenerative changes of the lower lumbar facet joints with grade I anterolisthesis of L4 on L5," with "L4–5 and L5–S1 degenerative disc disease."

neurogenic stenosis," and advised that "because of her size [5] and smoking history, [Mattox] is not a good candidate for surgical intervention, which if pursued, would most likely have to include a fusion."

The medical records Dr. Hubbell forwarded also included an office note from January 10, 2002, during which Dr. Hubbell reported that "physical therapy, including traction ... gave her excellent but temporary relief," and that Mattox had reported to him that her pain was the worst possible with standing and walking, but that she did not have pain while sitting or lying down. During the January 10 office visit, Dr. Hubbell also increased Mattox's intake of Neurontin from 600 to 800 milligrams, with a gradual increase to 2400 milligrams.

Finally, Mattox saw Dr. Hubbell on March 13, 2002. During that visit, Mattox self-reported that her lower back pain was the worst possible when walking and standing, with cumulative effects throughout the day. She also relayed to Dr. Hubbell that the increase in her Neurontin dosage had helped to alleviate pain in her knees. Finally, she reported that she had quit smoking on February 28, 2002.

On April 22, 2003 Mattox underwent a Functional Capacity Evaluation ("FCE") as directed by LINA.[6] The HealthSouth therapist who administered the FCE reported that Mattox had to sit after standing for only a few minutes,[7] had poor body mechanics, was unable to carry ten pounds for 100 feet, refused to crouch, squat or crawl, and was only able to climb a ladder once. Mattox reported an increase in her pain level to 10/10 upon attempting to climb the ladder.

Based on the findings during the FCE, the therapist prepared a Physical Ability Assessment ("PAA"), which concluded that Mattox could stand, walk, and reach occasionally (less than two and a half hours in an eight hour work day) and sit frequently (between two and a half and five and a half hours per work day).

The therapist placed Mattox into the light work physical demand category, which requires an employee to be able to exert "up to [twenty pounds] of force occasionally, and/or [ten pounds] force frequently, and/or a negligible amount of force constantly to move objects." Finally, the therapist noted that Mattox had provided an inconsistent performance and had exhibited self-limiting behavior.

LINA then completed a Transferable Skills Analysis for Mattox on May 27, 2003.[8] Based on her educational and vocational history, as well as the findings from the FCE, the 2003 TSA concluded that Mattox was capable of performing four occupations: preventive maintenance coordinator, department manager, skill-training program coordinator, and data processing auditor. Her actual occupation, administrative assistant, was not listed.

---

5. Mattox weighed 310 pounds at the time of Dr. Hubbell's evaluation.

6. The FCE was originally scheduled for February 12, 2003, but Mattox arrived with a wrist splint, stating that she had suffered a wrist sprain on February 9, 2003 while lifting her wheelchair. Based on her inability to perform grip strength testing without severe pain, the FCE was rescheduled.

7. Specifically, the therapist reported that "[f]requently during testing ... Mattox would state her pain had increased to a level 10/10 but after sitting [one to two] minutes it would decrease to resume testing activities with reports of decreased pain. She reported only needing to sit for a minute."

8. This is the second TSA that LINA completed for Mattox. An initial TSA, based solely on her mental impairments, was prepared on June 13, 2002. However, LINA relied on the 2002 TSA solely with regard to Mattox's claim for benefits under the Life Plan, and it will be discussed *infra* at Section I.D.

After receiving the TSA results, LINA noted on Mattox's claim file the absence of her actual occupation from the TSA's list of occupations she could perform. Specifically, because the FCE had concluded that she was only able to reach occasionally rather than frequently, she was not able to satisfy one of the physical demands associated with her position as an administrative assistant. A copy of the description from the Dictionary of Occupational Titles ("DOT") of the duties and physical demands of an administrative assistant—including frequent reaching—was placed in her claim file.[9]

On July 16, 2003, LINA received a Psychiatric Functional Assessment form ("PFA") and an EPA from Molly Keeton, Ph.D., and Young Song, M.D., Mattox's treating therapist and psychiatrist at the time. The PFA indicated that Mattox had reported "excruciating back pain that limits all activities and independence" which "has led to job loss, resulting in depressed mood, hopelessness, and anxiety." Under observations and clinical findings, the PFA stated that Mattox had reported a "history of depression, mood swings, impulsivity and [obsessive-compulsive] behaviors."

Under "Functionality," the PFA indicated that Mattox's "ADL's [are] limited by back pain. [Mattox] is emotionally capable of self-care but requires assistance physically. [Mattox] bathes and drives on her own and requires assistance with housework." As for Mattox's ability to recover and return to her previous level of functionality, the PFA simply indicated that her "chronic back pain impairs physical functioning." Finally, under the "Return to Work" section, the PFA listed "cannot

determine." Although neither the EPA nor PFA indicated any emotional limitations with regard to Mattox's temperaments and attitudes, they did indicate that Mattox's ability to perform repetitive work and her ability to perform a variety of duties without a loss of efficiency or composure "may be physically limited."

On August 12, 2003, per Mattox's request, LINA forwarded the FCE results to Dr. Hubbell for his review.[10] He responded on August 19, 2003, stating that he did not agree with the FCE's conclusion that Mattox could perform full-time light-duty work because he did not believe "her level of conditioning would allow [an] 8 hour day work."

On August 27, 2003, LINA held a claim staffing session to determine whether Mattox had physical limitations to support continuing her LTD Benefits past September 20, 2003. The subjective and objective findings relied on for the review included Mattox's November 21, 2001 lumbar x-rays, the office note documenting her March 13, 2002 office visit to Dr. Hubbell, and her July 16, 2003 PFA, as completed by Drs. Keeton and Song. In addition, the April 22, 2003 FCE results, including the finding that Mattox could only reach occasionally, were considered. The Associate Medical Director ("AMD") responsible for the review, Steven J. Feagin, M.D., stated the following:

> File discussed and data reviewed from a physical standpoint. FCE shows light capacity with self-limiting behavior. The reaching occasional . . . at desk level is not reasonable given the pathology and the self-limiting inconsistent effort.

---

9. In addition, although not noted by LINA in Mattox's claim file, AMVESCAP's job description for an executive administrative assistant lists the physical demands of the position as "[c]onstant movement throughout the building" and "[a]ble to lift ten pounds."

10. This was the second time LINA forwarded the FCE results to Dr. Hubbell. LINA had also forwarded the FCE to him on June 26, 2003, but received no response.

The deconditioning cited by [Dr. Hubbell] is not a factor in sedentary work which would be therapeutic.

On September 2, 2003, consistent with Dr. Feagin's comments, LINA terminated Mattox's LTD Benefits effective September 20, 2003, stating in relevant part:

Following our review of all the medical information, we have made a decision to terminate your claim. We have rendered this decision since the medical information on file fails to document you [sic] physical condition prevents you from performing your sedentary occupation. The medical information documents your complaints of low back pain for which you have a greater than 20 year history. It further documents, your indication of pain relief on sitting, as well as your physical ability to frequently sit. Although occasional desk level reaching was indicated while your occupation requires frequent desk level reaching, the medical information on file fails to provide for an underlying medical condition limiting your ability to reach to occasional. Further as you failed to give full effort during the FCE, we are only able to determine that your minimal ability to reach is occasional. Further although Dr. Hubbell's indicated deconditioning precluded full-time work, his opinion was unsupported.

Mattox appealed LINA's decision to terminate her benefits on March 7, 2004. In support of her appeal, she submitted the decision of an administrative law judge ("ALJ") awarding her social security disability benefits. The ALJ concluded that Mattox had been disabled since June 22, 2001. In support of this conclusion, the ALJ made several intermediate findings, including that Mattox had "medically determinable impairments diagnosed as morbid obesity, lumbar spondylolisthesis and depression."

Mattox also forwarded an office note from a November 11, 2003 visit with Dr. Hubbell to support her appeal. The office note stated in relevant part that Mattox "remains unfit for duty in any capacity because of her morbid obesity, lumbar spondylolisthesis, lumbar stenosis symptoms, and her extremely poor endurance and pulmonary situation." However, during the office visit, Mattox reported a pain level of zero because she was in a wheelchair.

On July 16, 2004, LINA held a second claim staffing session to review Mattox's appeal. In the limitations and restrictions category, Mattox's April 22, 2003 FCE, with its light-duty designation and her May 27, 2003 TSA, with its list of four alternative occupations, as well as Dr. Hubbell's disagreement with the FCE and Dr. Feagin's comments from the previous claim staffing session, were listed as having been reviewed. In addition, Dr. Hubbell's November 11, 2003 office note was referenced to the extent that it mentioned Mattox's lack of pain while sitting in a wheelchair. Based on these items, the reviewing AMD[11] concluded that the "medical [documentation] supports that [patient] has functionality at sedentary occupation" level.

---

**11.** Nowhere on the claim-staffing-session form does the name of the reviewing AMD appear. LINA now asserts that the AMD was Paul D. Seiferth, M.D. However, LINA did not provide Dr. Seiferth's name in its initial disclosures, and his signature is illegible on the form. As a result, Mattox had no notice of his identity and asks the Court to sanction LINA for its failure to disclose his name by prohibiting Dr. Seiferth from acting as a witness in this matter. The Court is troubled by LINA's failure to disclose, but, based on the Court's decision below to grant Mattox's motion for summary judgment with regard to LINA's termination of her LTD Benefits, LINA's error is harmless and the Court will not impose sanctions.

Relying on the AMD's conclusions from the July 16 claim staffing session, LINA denied Mattox's appeal on July 29, 2004, thereby upholding its decision to terminate her LTD Benefits as of September 20, 2003. Specifically, the letter stated that "it has been determined that the restriction placed by ... [Dr.] Hubbell that you are unfit for duty at any capacity is not supported to indicate an impairment of functional capacity severe enough to prevent you from performing sedentary work."

On October 14, 2004, Mattox disputed the results of her FCE by letter. In response, LINA notified her that it would treat her letter as a request for a second appeal of LINA's decision to terminate her LTD Benefits. However, LINA further advised Mattox that it would not initiate the second appeal, which was voluntary, until receiving new medical documentation, such as physician's office notes, hospital records, consultation reports, therapy notes, etc., to support Mattox's position that she was physically unable to perform her job.

Almost nine months later, on August 3, 2005, counsel for Mattox notified LINA that Mattox intended to pursue the second appeal of LINA's adverse decision. In furtherance of that appeal, she attached additional medical records from Mattox's office visits with Dr. Hubbell on June 24, 2003 and August 3, 2004.

At the June 24, 2003 visit, Mattox reported not being able to walk to the mailbox due to the severity of her back pain and suffering swelling in her feet and legs after sitting for two hours. During her physical exam, Dr. Hubbell noted that she had elevated blood pressure. He concluded that it "[s]eems unlikely that she could work in any capacity at this point."

At the August 3, 2004 visit, Mattox rated her pain as a four out of ten, with tenderness in her right gluteal musculature. She reported that the amount of pain in her right buttock while lying down, sitting, and at night had increased since her last visit.

The letter from Mattox's attorney also requested a copy of Mattox's claim file, which LINA forwarded on September 19, 2005. Finally, the letter stated that additional medical, vocational and other information to support the appeal would be forthcoming once the claim file had been received.

However, neither Mattox nor her attorney ever forwarded additional information, and LINA has taken no action with regard to Mattox's second appeal. Rather, Mattox filed the present suit, alleging that LINA wrongfully terminated her LTD Benefits. Mattox also claims that her LTD Benefits should be paid at approximately sixty-six percent of her salary rather than sixty percent.

## B. Increase in LTD Benefit Percentage

During the enrollment period for 2001, Mattox increased her LTD coverage from sixty percent of her earnings to 66.67 percent and, on January 15, 2001, began paying higher premiums to receive this additional coverage. When she began receiving LTD Benefits on September 21, 2001, Mattox asserted a right to payments at the higher percentage rate. However, on May 12, 2002, LINA notified her that because her last day worked (June 22, 2001) had occurred within twelve months of her election to increase her benefits, LINA would need to investigate whether the pre-existing condition limitation applied to her claim before paying at the higher rate.

The LTD Plan's pre-existing condition limitation states that

> The Insurance Company will not pay benefits for any period of Disability caused or contributed to by, or resulting

from, a Pre–Existing Condition. A Pre–Existing Condition means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a Physician within 3 months before his or her most recent effective date of insurance.

The Pre–Existing Condition Limitation will apply to any added benefits or increase in benefits. This limitation will not apply to a period of Disability that begins after an Employee is covered for at least 12 months after his or her most recent effective date of insurance, or the effective date of any added or increased benefits.

On May 10, 2002, LINA requested medical records from Mattox's treating physicians, including Dr. Prudent, from November 1 through December 31, 2000. The records LINA received indicated that Dr. Prudent had seen Mattox on November 8, 13 and 22, and December 6, 13, 20 and 27 for a mental illness. Based on these records and the fact that LINA had awarded Mattox LTD Benefits based on her depression—the diagnosis for which she had seen Dr. Prudent in late 2000—LINA informed Mattox on June 17, 2002 that she was not eligible to receive LTD payments at the increased percentage.

In that letter, UNA also notified Mattox that she could "request review of this denial by writing to the [LINA] representative signing this letter." However, although

Mattox submitted a complaint to the Georgia Office of Insurance when LINA first notified her that she may not be eligible for the optional benefit increase, Mattox never directly appealed LINA's June 17, 2002 denial.[12]

## C. Social Security Benefits

In its counterclaim, LINA asserts that it is entitled to recover a portion of the LTD Benefits actually paid to Mattox based on her collection of Social Security disability payments.

The LTD Plan provides for the reduction of an employee's LTD payments if and when the employee becomes eligible for "Other Income Benefits," including "Social Security disability or retirement benefits." The LTD Plan then states that any overpayments to the employee that have been made as a result of the employee's collection of Social Security disability payments may be collected either through a lump sum payment from the employee to LINA, a reduction of "any amounts payable" under the LTD Plan, or by taking "any appropriate collection action available to" LINA.

In addition, during the pendency of her LTD claim, Mattox signed a reimbursement agreement, thereby agreeing that if she later obtained disability payments from the Social Security Administration ("SSA"), she would "reimburse the full amount of any overpayment within [thirty] days after receiving the award."[13]

---

**12.** Mattox submitted the complaint on April 25, 2002. This complaint centered on LINA's statement in December 2001 that Mattox was not eligible for the optional increase in her LTD payment amount. However, that complaint was resolved when LINA explained that its eligibility determination had been based on incorrect information received from Mattox's employer. On May 10, 2002, LINA notified Mattox that she was in fact eligible for the

optional benefit increase, but that LINA would have to determine whether the pre-existing limitation applied prior to approving her request. The June 17, 2002 letter followed the ensuing investigation.

**13.** By signing the reimbursement agreement, Mattox avoided LINA's automatically reducing her LTD payments by her *estimated* Social Security disability award.

In December 2002, LINA engaged Advantage 2000 Consultants, Inc. to assist Mattox in obtaining social security disability payments. On March 26, 2004, after LINA had ceased making LTD payments to Mattox, an ALJ determined that Mattox was entitled to Social Security disability benefits and retroactively awarded them as of June 22, 2001. Based on this award, LINA, via Advantage 2000, calculated that it had overpaid LTD Benefits to Mattox in the amount of $35,582.17 and informed Mattox that it expected her to reimburse the overpaid benefits. Mattox has refused.

### D. The Life Plan

The Life Plan provides for the waiver of an employee's life insurance premium ("WOP Benefit") while the employee is disabled. However, the requirements of the Life Plan differ from those in the LTD Plan: to qualify as disabled under the Life Plan, an employee must not be able "to perform all the material duties of *any* occupation for which he or she may reasonably become qualified based on education, training or experience," whereas an employee need only show his inability to perform the material duties of his regular occupation (or a qualified alternative) to obtain LTD Benefits. (Emphasis added.)

Relying solely on the EPA that Dr. Prudent had completed on February 21, 2002,[14] LINA performed a TSA for Mattox on June 13, 2002.[15] This TSA, prepared by a rehabilitation specialist, identified four alternate occupations that Mattox could perform based on the activities Dr. Prudent listed she was able to do and her education and work history. Based on the TSA's findings, LINA denied Mattox's WOP Benefit claim on June 17, 2002, stating in part,

It has been determined that you are not Disabled from performing any and all occupations. The information in your file reflects that you are capable of performing less demanding work, and that you do possess transferable skills to perform other occupation[s]. Based on this information, we must regretfully advise you that we are unable to give a favorable decision for your [WOP] claim....

Once again, although LINA notified Mattox in its denial letter that she could request a review of the adverse decision, Mattox never appealed LINA's determination with regard to the WOP Benefit.

On September 1, 2006, Mattox filed this suit against LINA, alleging that her LTD Benefits were wrongfully terminated as of September 20, 2003, that her LTD Benefits should have been paid at sixty-six percent of her salary rather than at sixty percent, and that LINA wrongfully denied her claim for a waiver of her life insurance premium under the life Plan.[16] LINA has

---

**14.** At that time, LINA still had not received any medical records from Dr. Hubbell, nor had it received updated medical records from Dr. Najjar despite repeated requests.

**15.** This is the first TSA that LINA prepared for Mattox. A second TSA was completed on May 27, 2003 and is discussed *supra* in Section I.A.

**16.** Mattox also makes vague allegations that LINA has breached its fiduciary duty to her. It is unclear to the Court whether this is a separate claim for relief than Mattox's denial-of-benefits claim, and Mattox does not fully

address this issue in her summary judgment brief. Although Congress established "standards of conduct, responsibility and obligations for fiduciaries of employee benefits plans" when it passed 29 U.S.C. § 1101, Mattox has not provided sufficiently specific allegations as to how LINA has breached its fiduciary duty to her independent of its benefit determinations. Consequently, Mattox's motion for summary judgment, to the extent it asserts a claim for breach of fiduciary duty, is denied. *See Burt v. Metro. Life Ins. Co.,* No. 1:04–cv–2376–BBM, 2005 WL 4712457, at *14 (N.D.Ga. Sept. 16, 2005).

counterclaimed for recovery of the $35,582.17 in LTD Benefits it alleges it has overpaid Mattox.

The case now comes before the Court on the parties' cross-motions for summary judgment.[17] In addition, LINA has moved to strike several exhibits attached to Mattox's summary judgment brief.[18] Because the Court has not relied on any of the challenged evidence in resolving the parties' substantive motions, the Court denies LINA's motion to strike as moot and turns to the parties' motions for summary judgment.

## II. Motions for Summary Judgment

### A. Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions

and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fairminded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

### B. Exhaustion of Remedies

The Court first turns to LINA's refusal to pay Mattox's LTD Benefits at sixty-six rather than sixty percent and to LINA's denial of Mattox's claim for the WOP Benefit.

On June 17, 2002 LINA notified Mattox that she was not eligible for the optional increase in her LTD payment because she had been treated for depression within twelve months of her election—the diagnosis for which LINA had awarded her LTD Benefits. That same day, LINA sent another letter to Mattox notifying her that she was not eligible for the WOP Benefit because she was not disabled from "performing any and all occupations." Mattox did not appeal either of these decisions.

 "ERISA plaintiffs must exhaust administrative remedies before bringing suit." *Oliver v. Coca Cola Co.*, 497 F.3d

---

17. Mattox has filed a motion to file excess pages in support of her motion for summary judgment. The Court hereby grants said motion and has considered all submissions in arriving at the rulings below.

18. LINA has also moved to strike Mattox's statement of material facts for violating the Local Rules by asserting multiple alleged facts and legal conclusions in each numbered paragraph and by citing to the entire administrative record rather than a specific page or set

of pages from the record for eight of her paragraphs. Given that Mattox's statement of material facts consists of 136 numbered paragraphs, the Court finds that Mattox has substantially complied with the Local Rules such that striking the entire submission would be inappropriate. Rather, the Court has not considered those portions of her statement of material facts that do not comply with the Local Rules and hereby denies LINA's motion to strike.

1181, 1200 (11th Cir.2007), *vacated in part,* 506 F.3d 1316 (2007). However, "[t]he decision of a district court to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision." *Perrino v. S. Bell Tel. Co.,* 209 F.3d 1309, 1315 (11th Cir.2000). "Excusal of the exhaustion requirement is appropriate when resort to the administrative remedies would be futile or the remedy inadequate." *Oliver,* 497 F.3d at 1200 (quotations omitted).

■ With regard to LINA's refusal to pay Mattox the increased LTD payment amount, there was no indication at the time of LINA's decision in June 2002 that an appeal would be futile. In fact, because LINA's decision to deny Mattox's claim for the increased LTD payment was based on the assumption that the source of her disability was her depression, Mattox could have submitted the same documentation in furtherance of this appeal that she used in support of her appeal of LINA's decision to terminate her LTD Benefits after twenty-four months. The fact that LINA later denied Mattox's appeal of its determination that her sole disability was mental in nature (and would most likely have also denied an appeal of its determination with regard to the increased benefit amount) does not change the Court's conclusion. The futility of an appeal must be determined based on the information Mattox had when deciding whether to appeal. *See Dozier v. Sun Life Assurance Co. of Canada,* 466 F.3d 532, 535–36 (6th Cir.2006).

■ The Eleventh Circuit has cited with approval *Dozier,* in which the Sixth Circuit was faced with a situation instructive to this Court's analysis of Mattox's duty to exhaust her remedies with regard to LINA's denial of her claim for the WOP Benefit. There, the plaintiff participated in both his long-term disability plan and his life insurance plan, which included a waiver of premium benefit. Under the long-term disability plan, the plaintiff needed only to show that he was disabled from his own occupation, while under the life insurance plan he needed to establish that he was disabled from any occupation. The Sixth Circuit held that the plaintiff's failure to appeal the insurance company's denial of his waiver of premium benefit under the "any occupation" standard should be excused because it would have been futile; the insurance company had already determined that he was not even disabled from his *own* occupation under the long-term disability plan.

*Dozier* is instructive yet distinguishable. Here, LINA had actually approved Mattox's claim for LTD Benefits, albeit under the mental illness provision, when it denied her claim for the WOP Benefit. Further, the Life Plan contains no mental illness limitation; as long as Mattox was disabled from any occupation for either mental or physical reasons, she could obtain the WOP Benefit. Therefore, it is far from clear that an appeal of LINA's denial of the WOP Benefit would have been futile, and the Court is not inclined to excuse Mattox's failure to exhaust her administrative remedies with regard to these denials under ERISA.

Accordingly, because Mattox failed to appeal these adverse decisions and thereby exhaust her administrative remedies with regard to the LTD Benefit increase and the WOB Benefit, LINA's motion for summary judgment is granted on these issues.

Mattox did, however, appeal LINA's decision to terminate her LTD Benefits after twenty-four months, and the Court must now determine whether to uphold that decision.

### C. ERISA Standard of Review

"ERISA does not provide a standard to review decisions of a plan administrator." *Paramore v. Delta Air Lines, Inc.,* 129

F.3d 1446, 1449 (11th Cir.1997). However, the Supreme Court has stated the following:

A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... [I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Based on this language, the Eleventh Circuit has "adopted three standards of review for plan interpretations: (1) *de novo,* ... where the plan administrator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest." *Paramore,* 129 F.3d at 1449.

Pursuant to this framework, the Court must first determine whether LINA is afforded discretion by the LTD Plan.

██ One of the requirements of the LTD Plan is that the employee provide "satisfactory proof of Disability before benefits will be paid." The Eleventh Circuit has found "satisfactory proof" language to confer discretion on the administrator of a plan governed by ERISA. *Tippitt v. Reliance Std. Life Ins. Co.,* 457 F.3d 1227, 1233 (11th Cir.2006) (interpreting *Levinson v. Reliance Std. Life Ins. Co.,* 245 F.3d 1321 (11th Cir.2001) as binding precedent on this issue).[19] As a result, the LTD Plan confers discretion on LINA, and the Court must apply the arbitrary and capricious, as opposed to the *de novo,* standard to LINA's termination of Mattox's LTD Benefits.[20]

Next, the Court must determine whether LINA has a conflict of interest sufficient to trigger application of the heightened arbitrary and capricious standard.

██ An administrator has a conflict of interest when it is both the claims administrator and the payer of claims. *Torres v. Pittston Co.,* 346 F.3d 1324, 1328 (11th Cir.2003) (citing *Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1561–62 (11th Cir.1990)). Here, LINA was both the decision-maker and the potential payer

**19.** Mattox asks the Court to certify to the Eleventh Circuit prior to ruling on the issue of whether the "satisfactory proof" language confers discretion, arguing that every other circuit has held that this language does *not* confer discretion. *See, e.g., Kinstler v. First Reliance Std. Life Ins. Co.,* 181 F.3d 243, 251–52 (2d Cir.1999) (distinguishing between "satisfactory to us" language and "satisfactory proof" language). However, the Eleventh Circuit, in *Tippitt,* has already held that "satisfactory proof" language confers discretion. Consequently, certifying the issue would be a waste of judicial resources, and Mattox's request is denied.

**20.** Mattox also argues that LINA's failure to issue a decision after Mattox's second appeal constitutes a "deemed denial" and that the *de novo* standard therefore should apply rather

than a heightened arbitrary and capricious standard. *See, e.g., Gritzer v. CBS, Inc.,* 275 F.3d 291, 295–96 (3d Cir.2002) (applying the *de novo* standard where an administrator has been afforded discretion but has not exercised that discretion). However, LINA did in fact issue two detailed decisions with regard to Mattox's claim: the initial termination on September 2, 2003, and the denial of her first appeal on July 29, 2004, and the Court has ample evidence that Mattox did in fact exercise its discretion with regard to Mattox's claim. *Cf. Nichols v. Prudential Ins. Co. of Am.,* 406 F.3d 98, 109 (applying the *de novo* standard for deemed denials because "the court [is left] without any decision or application of expertise to which to defer"). As a result, the *de novo* standard does not apply to LINA's decision to terminate Mattox's LTD Benefits after twenty-four months.

of Mattox's LTD Benefits. As a result, LINA was operating under a conflict of interest when reviewing Mattox's LTD claim, and the Court must determine whether LINA's interpretation of the LTD Plan's provisions and its application of the policy to Mattox satisfy the heightened arbitrary and capricious standard. *See Torres*, 346 F.3d at 1328 (applying the heightened standard to both the administrator's interpretation of the policy and its factual determinations).

■ When applying the heightened arbitrary and capricious standard, a court must first decide "if the claims administrator's decision is wrong." *Potter v. Liberty Life Assurance Co. of Boston*, 132 Fed. Appx. 253, 257 (11th Cir.2005) (internal quotations omitted). "If so, the court then determines whether the decision is nonetheless reasonable (i.e. not arbitrary and capricious)." *Id.* "If the decision is wrong but reasonable, the burden is [then] on the claims administrator to show the decision was not tainted by self-interest." *Id.* (citing *Brown*, 898 F.2d at 1566–67).

■ LINA first argues that as a matter of law it was not wrong (and therefore right) to terminate Mattox's LTD Benefits after twenty-four months because Mattox's disability was at least contributed to by her depression, thereby triggering the mental illness provision's limitation to twenty-four payments.

However, LINA did not take this position during investigation of Mattox's disability. Although it initially approved her LTD claim under the mental illness provi-sion, it continued to investigate Mattox's disability from a physical standpoint as well. Specifically, LINA stated in its February 19, 2002 approval letter that "[t]he most recent documentation on file reveals that you suffer from knee/foot and back pain," thereby implying that if Mattox could provide sufficient documentation of her physical disability, she would be eligible to receive LTD Benefits beyond the twenty-four-month period established by the mental illness provision. Therefore, LINA's attempt to argue to this Court that Mattox could only *ever* receive twenty-four LTD payments is disingenuous and constitutes a "post-hoc explanation" for its termination of her benefits. *See Smith v. Cont'l Cas. Co.*, No. 1:06-CV-1441-WSD, 2007 WL 2071538, at *15 (N.D.Ga. July 16, 2007) ("In ERISA cases, 'post hoc explanations are without merit.' ") (quoting *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 706 (11th Cir.1995)).[21]

■ LINA next argues that as a matter of law it was not wrong (and therefore right) to terminate Mattox's LTD Benefits because Mattox retained the physical ability to perform her sedentary occupation and was therefore not disabled under the LTD Plan's definition.

However, LINA ignores the fact that the administrative record contains several medical opinions that Mattox *was* physically disabled. For example, Dr. Hubbell stated several times that Mattox could not work in *any* capacity and directly disputed the FCE's conclusion that she could perform sedentary work. In light of this contradictory evidence, it would be inap-

21. Even if LINA had presented this argument during claim investigation, the Court could not rule that as a matter of law LINA's decision to terminate Mattox's LTD Benefits after twenty-four months was not wrong. This is because contrary evidence, including the opinions of several of Mattox's treating physicians that her depression was secondary to her back pain rather than an independent basis for her disability, exists in the administrative record. *See Wise v. Hartford Life & Accident Ins. Co.*, 360 F.Supp.2d 1310, 1320 (N.D.Ga.2005) (refusing to grant summary judgment to insurance company under first prong where several medical opinions in the record suggested that the plaintiff was totally disabled).

propriate to rule that as a matter of law LINA's decision to terminate Mattox's LTD Benefits was not wrong. *See Wise,* 360 F.Supp.2d at 1320. For the same reason, however, the Court cannot rule, as a matter of law, that LINA's decision *was* wrong. *See id.* Moreover, even if the Court could determine that LINA's decision was wrong as a matter of law, it would still be necessary to determine whether, though wrong, it was still reasonable. *See Potter,* 132 Fed.Appx. at 257.

Under the second prong of the heightened arbitrary and capricious standard, the Court must "determine whether there was a reasonable basis for the decision to deny benefits, based on the facts as known to the [insurance company] at the time the decision was made." *Brown,* 898 F.2d at 1559.

Mattox first argues that LINA's decision to terminate her LTD Benefits after twenty-four months was unreasonable as a matter of law because LINA categorized her disability as a mental illness when in fact her depression was merely a symptom caused by her slipped disc with stenosis. However, even though LINA arguably could have stopped at determining that Mattox's disability was at least contributed to by her depression, it reviewed Mattox's disability from a physical standpoint as well. Therefore, Mattox's contention that LINA reviewed her claim for LTD Benefits solely from a mental standpoint is meritless, and LINA's decision therefore was not unreasonable as a matter of law.[22]

Mattox next contends that LINA's decision to terminate her LTD Benefits was unreasonable as a matter of law because LINA gave too much weight to the opinions of the AMDs who reviewed her file and to the conclusions of the FCE while discounting her treating physicians' opinions.[23] Specifically, although Drs. Hubbell, Keeton and Song all reported that Mattox was disabled due to physical limitations associated with her inoperable spinal stenosis, LINA declined to deem Mattox physically disabled.

In its correspondence terminating Mattox's LTD Benefits and denying her appeal, LINA cited portions of Mattox's records from her visits to Dr. Hubbell,[24] favorable portions of the PFA that Drs. Keeton and Song completed on behalf of

---

**22.** Mattox also contends that LINA's decision was unreasonable as a matter of law because it failed to consider many of Mattox's disabling conditions during its review, including her obesity, sleep apnea, insomnia, high blood pressure and the disabling effects of the medication she took. However, the proof-of-loss form that Mattox submitted to LINA to support her LTD claim did not state that she was disabled for any of these reasons, but rather that she suffered from a "slipped disc with stenosis." As a result, LINA cannot be faulted for failing to investigate these conditions. *See Burt v. Metro. Life Ins. Co.,* No. 1:04–CV–2376–BBM, 2005 WL 4712457, *2–3 (N.D.Ga. Jan. 31, 2006):

> Taken to its logical conclusion, however, [plaintiff's] reasoning would necessarily require [defendant] 'to investigate each and every diagnosis listed in any medical record in plaintiff's claim file to determine if *any* condition rendered plaintiff disabled under

the terms of the Plan,' rather than those listed by the claimant himself. Such is inconsistent with the terms of ERISA.

**23.** Mattox also contends that LINA should have given more weight to the SSA's determination that she was totally disabled. It is true that "[a] district court may consider a[SSA] determination of disability in reviewing a plan administrator's determination of benefits under a plan governed by ERISA." *Potter,* 132 Fed.Appx. at 259 n. 5. However, "it is not determinative." *Id.* Here, where the SSA's decision to award Mattox benefits rested in part on her emotional inability to focus her attention and her depression, that decision carries little weight with regard to proving her level of physical functionality.

**24.** During her November 11, 2003 office visit, Mattox reported to Dr. Hubbell that she had a pain level of zero while sitting in a wheelchair.

Mattox, and the FCE's conclusion that she could perform light work. Further, LINA relied heavily on the opinion of the reviewing AMDs. Specifically, Dr. Feagin, upon review of Mattox's claim file, had determined that the FCE's conclusion that she could only reach occasionally—the only conclusion that supported a finding that Mattox could not perform her normal occupation—was "not reasonable given the pathology and the self-limiting inconsistent effort." In addition, although Dr. Hubbell had disputed the FCE's conclusion that Mattox could perform light work by stating, "I don't believe her level of conditioning would allow 8 hour work day," Dr. Feagin discounted this opinion due to Dr. Hubbell's failure to attach office records or other objective evidence in support of his opinion.

■ Although the Court is not convinced that LINA's determination that Mattox was not physically disabled is the only conclusion LINA could have made on the record before it, that conclusion was certainly reasonable, and LINA has adequately demonstrated that there is no genuine issue of material fact under this prong. *See Wise,* 360 F.Supp.2d at 1321; *see also Paramore,* 129 F.3d at 1452 (finding decision to terminate benefits "reasonable," and affirming summary judgment in favor of administrator notwithstanding existence of some evidence supporting the plaintiff's disability).

■ The Court's decision is guided by the principle that under the heightened arbitrary and capricious standard, "[p]lan administrators are not required to give special deference to the opinions of treating physicians." *Hufford v. Harris Corp.,* 322 F.Supp.2d 1345, 1359 (M.D.Fla.2004) (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)). Rather, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." *Hufford,* 322 F.Supp.2d at 1359. Based on this principle, LINA was justified in crediting the opinions of Drs. Feagin and Seiferth, who determined that Mattox was able to perform her sedentary occupation after reviewing her claim file, rather than the opinions of Mattox's treating physicians.[25]

■ Because LINA's decision was not right as a matter of law—but also reasonable—the burden shifts to LINA to prove that its decision to terminate Mattox's LTD Benefits was not tainted by self-interest. *Brown,* 898 F.2d at 1566–67. As a plan administrator, LINA can "purge the taint of self-interest" by producing evidence that its determinations benefited the class of plan participants or represented a uniform construction of the LTD Plan. *Id.* at 1568.[26]

25. Notably, two out of the three physicians Mattox relied on to support her contention that she was physically disabled were her psychologist and psychiatrist, who treated her for her issues with depression. On the PFA, they stated that Mattox "reports excruciating back pain that limits all activities of independence .... [and] reports that back pain has led to job loss, resulting in depressed mood, hopelessness & anxiety." *Cf. Hufford,* 322 F.Supp.2d at 1356 (requiring objective evidence of disability because if "an opposite rule [were] to apply, LTD benefits would be

payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional").

26. The Eleventh Circuit has only applied this burden-shifting approach to plan administrators' legal interpretations of policy language. *See Brown,* 898 F.2d at 1568. Yet, district courts have determined that this burden-shifting framework should apply equally to factual determinations such as the one LINA made with regard to its termination of Mattox's

█ LINA has failed to carry its burden to prove that its decision to terminate Mattox's LTD Benefits was not tainted by self-interest. LINA has offered *no* evidence that its factual determination that Mattox was not physically disabled either benefited the class of plan participants or represented a uniform construction of the LTD Plan. In light of LINA's complete failure to meet this burden, or even present any evidence in support of it, the Court grants Mattox's motion for summary judgment with regard to LINA's termination of her LTD Benefits.[27] *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (stating that where the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party); *see also Burt,* 2005 WL 4712457, at *14.

Before the Court can enter judgment in favor of Mattox with regard to the reinstatement of her LTD Benefits and the recovery of her past due LTD Benefits, the dollar amount of the judgment must be established. Mattox has requested the opportunity to submit a supplemental brief to address this issue, and the Court hereby grants Mattox's request. Mattox's supplemental brief is due within ten days of the entry of this Order, and LINA will have another ten days in which to respond to said brief.

### III. LINA's Counterclaim for Overpaid LTD Benefits

LINA has also moved for summary judgment on its counterclaim for recovery of the $35,582.17 in LTD Benefits it has overpaid Mattox. Under the terms of the LTD Plan, if an LTD claimant becomes eligible for and begins receiving Social Security disability payments, LINA is entitled to reimbursement of that amount in past LTD Benefits paid to the claimant. Further, the LTD Plan provides that LINA may recover such overpayments by requesting a lump sum payment of the overpaid amount, reducing future amounts

---

LTD Benefits. *See, e.g., Burt,* 2005 WL 4712457, at *13–14; *Wise,* 360 F.Supp.2d at 1322. However, district courts have disagreed about how best to apply the *Brown* framework to factual determinations. For example, in *Wise,* the court applied a "comparative, objective analysis" and stated that "[a] conflicted plan administrator may carry its burden ... if it can demonstrate that the opinions and evidence it relied on [in] denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reasonable as the countervailing opinions and evidence then before it." *Id.* at 1323. Another district court has rejected this approach as "further enmesh[ing] the court in medical analyses that it is particularly unqualified to perform" and instead inserted a caveat into the *Brown* framework, holding that "the claim provider cannot meet its burden simply by asserting that its denial of coverage as to one claimant benefits the plan participants to the extent that there is more money available to pay out worthier claims." *Burt,* 2005 WL 4712457,

at *13. Due to LINA's complete failure to present evidence on this element, the Court need not determine which standard is better reasoned.

27. Mattox makes several other arguments in her summary judgment papers as to why LINA's decision-making process was flawed. For example, she contends that LINA failed to follow its internal policies and procedures during the investigation of her claim and that LINA violated ERISA by failing to request up-to-date medical records prior to making its decision to terminate her LTD Benefits. In addition, she argues that judicial estoppel should bar LINA from asserting that she is not physically disabled because LINA represented to the SSA that she was completely disabled. However, the Court's determination that summary judgment is due to be granted in favor of Mattox with regard to LINA's termination of her LTD Benefits makes an analysis of these issues unnecessary.

payable under the LTD Plan, or taking other "appropriate collection action."

In addition, Mattox signed a reimbursement agreement in which she promised to repay any overpaid LTD Benefits upon receipt of Social Security disability payments.

Finally, it is undisputed that an ALJ retroactively awarded Mattox Social Security disability payments as of June 22, 2001, resulting in an overpayment of LTD Benefits to Mattox in the amount of $35,582.17.

■ Mattox concedes that the type of relief LINA is seeking is equitable in nature and thereby permitted by ERISA. 29 U.S.C. § 1132(a)(3). However, Mattox contends that LINA's counterclaim fails as a matter of law because LINA is seeking to attach Mattox's future Social Security disability payments—her only source of income—which violates the Social Security Act's anti-assignment provision, 42 U.S.C. § 407(a).[28]

Section 407(a) prohibits the "execution, levy, attachment, garnishment, or other legal process, [including] the operation of any bankruptcy or insolvency law against" the future payments of Social Security disability benefits. One court has held that an insurance company's attempt to impose a constructive trust on a claimant's future Social Security disability payments would violate § 407(a). *See Ross v. Pa. Mfrs. Ass'n Ins. Co.*, No. Civ.A. 1:05–0561, 2006 WL 1390446, at *8 (S.D.W.Va. May 22, 2006). However, the better reasoned opinions that have addressed this issue hold that § 407(a)'s prohibition is not triggered

by this kind of reimbursement provision because the insurance company "seeks the amount it overpaid [the claimant rather than] any of [the claimant's] Social Security benefits." *Gilcrest v. Unum Life Ins. Co. of Am.*, No. 05–CV–923, 2006 WL 2251820, at *2 (S.D.Ohio, Aug. 4, 2006). The fact that Mattox may have to use her Social Security disability benefits to repay the amount LINA has overpaid her does not alter the Court's analysis. *See, e.g., Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 901 (8th Cir. 2006).

■ Finally, because this Court has already ruled that LINA must reinstate Mattox's LTD Benefits, LINA can exercise its right to reduce her future LTD payments to recoup the amount it has overpaid Mattox. This moots Mattox's concern that it would be in inequitable for the Court to order her to reimburse LINA for the $35,582.17 in overpaid benefits when her only source of income is her monthly Social Security disability payments.

Accordingly, because § 407(a) does not apply to LINA's counterclaim and because the equities do not bar LINA's recovery, the Court grants LINA's motion for summary judgment with regard to its counterclaim.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [48] is GRANTED in part and DENIED in part, Defendant's motion for summary judgment

---

**28.** Mattox also argues that the statute of limitations period expired prior to the filing of LINA's counterclaim. She asserts that the limitations period began running when LINA made its last LTD payment to Mattox, which occurred more than three years before LINA filed its counterclaim. Mattox's characterization of when the limitations period began is incorrect. The limitations period could not begin to run until Mattox received her SSA disability award on March 26, 2004, which occurred less than three years prior to the filing of LINA's counterclaim. Therefore, the limitations period did not expire prior to LINA's assertion of its right to the reimbursement of the overpaid LTD Benefits.

is GRANTED in part and DENIED in part, Defendant's motion to strike Plaintiff's statement of material facts [54] is DENIED, Defendant's motion to strike exhibits attached to Plaintiff's motion for summary judgment [56] is DENIED AS MOOT, and Plaintiff's motion for leave to file excess pages [59] is GRANTED.